**SO ORDERED.**

**SIGNED this 30 day of March, 2011.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARC WILLIAM DITTMAR, | ) | Case No. 05-17094 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |

## MEMORANDUM OPINION

The debtor Marc Dittmar amended his schedules B and C to add references to two items of personal property and to exempt them after the Tenth Circuit Court of Appeals reversed an order of this Court and held that the items were property of Dittmar's bankruptcy estate under 11 U.S.C. § 541 that are subject to the Trustee's administration.[1] The property in question is comprised of the "Spirit bonus" payment received in December of 2006 by former Boeing employees who remained Spirit employees and the stock received by these same employees pursuant to their collective

_____

[1] *See Parks v. Dittmar*, 618 F.3d 1199 (10th Cir. 2010).

bargaining agreement with Spirit. This Court had previously held that these items of property were not sufficiently rooted in the pre-bankruptcy past to be property of Dittmar's bankruptcy estate.[2] On the Trustee's appeal, the Circuit reversed this Court's order denying the Trustee's motion for turnover, concluding that the debtor's entitlement to these items were part of his bankruptcy estate. Thereafter, the debtor amended his Schedules B and C to include these assets as property of the estate and claimed them as partially exempt earnings under KAN. STAT. ANN. § 60-2310 (2005).[3] The Trustee objects to the exemption claim.[4]

The Trustee bears the burden of proof on exemption objections.[5] The parties have stipulated to the relevant facts and have submitted briefs.[6] The Court has reviewed the stipulations and briefs and is prepared to rule.[7]

Facts

Dittmar worked for Boeing Commercial Aviation in Wichita under a collective bargaining agreement. In late 2004, an investor group known as Onex became interested in acquiring Boeing's

---

[2] *In re Lowe, et al,* 380 B.R. 251 (Bankr. D. Kan. 2007).

[3] Dkt. 78 and 79.

[4] Dkt. 84.

[5] Fed. R. Bankr. P. 4003(c).

[6] Dkt. 92, 93 and 95. Debtor Marc Dittmar appeared by his attorney Don Riley. The chapter 7 trustee Linda Parks appeared by her attorney Gaye Tibbets.

[7] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (E).

commercial operations in Wichita and began to negotiate with Boeing for the purchase. To accomplish this acquisition, Onex formed a holding entity Spirit AeroSystems Holdings, Inc. ("Spirit"). As part of the ongoing negotiations, Spirit entered into collective bargaining with the International Association of Machinists and the International Brotherhood of Electrical Workers, the two unions representing Boeing Wichita employees. In its dealings with the unions, Spirit sought wage concessions that included a 10 per cent pay cut. In an effort to secure ratification of the contract that included the pay cut, Spirit and the unions negotiated an equity participation program ("EPP"). Under the EPP, union members would receive cash or stock if the company completed an initial public offering, sold out, or merged (any of which was characterized as a "payment event"), so long as the payment event yielded a fifteen percent annual profit to the initial equity investors. If a payment event occurred, each employee who had been employed at Boeing on a date certain (June 17, 2005) and who had worked for 90 continuous working days would receive a cash bonus and shares of Spirit stock. These benefits were called "Stock Appreciation Rights" or "SARs." Prior to Dittmar's petition date, October 7, 2005, the unions verbally agreed to a contract that would contain the EPP. After several attempts, the unions' members ratified the collective bargaining agreements in June, 2005.

On November 16, 2006, a year after Dittmar filed his bankruptcy, Spirit opted to make an initial public offering of stock, a payment event that triggered benefits for Dittmar and his co-workers. Thereafter, Spirit paid him a gross amount of $34,556 resulting in an after-tax payment of $21,546.67.[8] On March 29, 2007, Spirit paid Dittmar an additional $30,141.10 which was

---

[8] Dkt. 95, Ex. A.

converted into Spirit equity that, after taxes, was initially valued at $18,792.96.[9]

The Trustee sought an order for turnover concerning these funds and the stock.[10] After discovery and after the parties filed motions for summary judgment in which each agreed that there were no disputed facts, this Court granted summary judgment for Dittmar and denied the turnover in an order dated December 24, 2007.[11] This Court concluded that the SARs benefits were too remote to be rooted in the pre-bankruptcy past and were therefore not property of the estate. The Trustee appealed that order to the BAP which affirmed.[12] On further appeal, the Tenth Circuit, in a split decision, reversed without remanding the matter.[13] The Circuit's mandate effectively operates as an order granting the Trustee's turnover motion. In response to that mandate, Dittmar amended his schedules B and C to claim the SARs as property and to exempt them as exempt compensation under KAN. STAT. ANN. § 60-2310. The Trustee objected to the exemption, asserting that the SARs are not part of Dittmar's "compensation" that is protected from garnishment by the Kansas statute.

Analysis

The issue here is whether the SARs benefits received by Dittmar constituted compensation that is protected by the Kansas earnings exemption in KAN. STAT. ANN. § 60-2310.[14] That statute

---

[9] Dkt. 95, Ex. B.

[10] Dkt. 16.

[11] Dkt. 67. *See In re Lowe, supra.*

[12] *In re Dittmar, et al,* 410 B.R. 71 (10th Cir. BAP 2009).

[13] *Parks v. Dittmar, supra.*

[14] The Trustee also objected to debtor's exemption on the grounds of laches and that the debtor may not exempt property recovered by the trustee after he voluntarily transferred it under § 522(g). Dittmar's "delay" in claiming the exemption is easily explained by the long journey this case has taken from an evidentiary hearing in this Court in early 2007, wherein the Court

4

provides –

> only the aggregate disposable *earnings* of an individual may be subjected to wage garnishment. The maximum part of such *earnings* of any wage earning individual which may be subjected to wage garnishment for any workweek or multiple thereof may not exceed the lesser of: (1) Twenty-five percent of the individual's aggregate disposable earnings for that workweek or multiple thereof; (2) the amount by which the individual's aggregate disposable earnings for that workweek or multiple thereof exceed an amount equal to 30 times the federal minimum hourly wage, or equivalent multiple thereof for such longer period; or (3) the amount of the plaintiff's claim as found in the order for garnishment.[15]

As used in the statute, the term "earnings" is defined at subsection (a)(1) as "*compensation* paid or payable for personal services, whether denominated as wages, salary, commission, bonus or otherwise" and "disposable earnings" is defined at subsection (a)(2) as that part of an individual's earnings that remain after legal deductions (like taxes) are taken out.

Do the SARs benefits fall within the definition of "compensation paid or payable for personal services?" The Trustee argues that these benefits were more akin to stock options than wages and, accordingly, are not compensation for work performed in the sense that wages or salary typically are. In addition, she claims that these payments cannot be attributed to any particular pay period, making them more like bonuses than wages. The debtor responds that even the Circuit referred to the SARs as "compensation"[16] and claims that these benefits were intended to make up for the pay give-backs that Sprit negotiated in the collective bargaining agreements in 2005,

---

issued an interim order on similar turnover motions in related cases (*See In re Lowe,* No. 05-14936, Dkt. 35), to a fully briefed and argued appeal to the Tenth Circuit that was not decided until the Autumn of 2010. The Court is satisfied that debtor filed his exemptions timely once he learned (from the Circuit's opinion) of his need to do so. The Trustee makes no mention of her § 522(g) objection in her papers and the Court deems it abandoned.

[15] KAN. STAT. ANN. § 60-2310(b) (emphasis added).

[16] *See Parks v. Dittmar*, 618 F.3d at 1204.

5

rendering them the functional equivalent of earnings.

The Court concludes that the SARs were compensation paid by Spirit to the debtor as part of the consideration for his prior work. In order to participate in the program, the debtor had to have been employed on "day one" and remain employed on the effective date of the IPO. This sufficiently ties the payment of these benefits to the debtor's personal services: had he rendered no services in the defined period, he would not have been entitled to the payment. In addition, the SARs benefits appear to have been paid as wages with Spirit issuing paychecks with pay-stubs that represented them. The Circuit concluded that Dittmar initially received an interest in these benefits before he filed his petition, even though that interest was contingent upon the occurrence of a payment event and Dittmar's continued employment. Finally, the juxtaposition of the SARs with the wage give-back, while not dispositive, cannot be ignored.

This Court has previously held that KAN. STAT. ANN. § 60-2310 is a wage exemption statute.[17] As the Court detailed in *Urban*, this statute was enacted contemporaneously with KAN. STAT. ANN. § 60-717, the garnishment statute.[18] That statute limits the attachment of an order of garnishment to the "nonexempt" portion of a debtor's earnings and defines that "nonexempt" portion as those earnings "not exempt from wage garnishment pursuant to K.S.A. 60-2310."[19] As this Court

---

[17] *In re Urban*, 262 B.R. 865, 867-70 (Bankr. D. Kan. 2001).

[18] The Court notes that this garnishment statute, KAN. STAT. ANN. § 60-717 was repealed in 2002, a year after this Court decided *Urban. See* 2002 KAN. SESS. LAWS, ch. 198, § 19. In its place, KAN. STAT. ANN. § 60-734 (2005) was enacted but the new garnishment statute retained the key language in former § 60-717(c) at issue here.

[19] The current version of the garnishment statute, KAN. STAT. ANN. § 60-734(c) (2010 Supp.) provides: "The order of garnishment must have the effect of attaching the nonexempt portion of the judgment debtor's earning . . . Nonexempt earnings are earnings which are not exempt from wage garnishment pursuant to K.S.A. 60-2310, and amendments thereto."

6

further held in *In re Resler*, this statute permits a debtor to exempt earned but unpaid wages in the hands of the employer.[20] Here, as the Circuit has held, these benefits were unpaid as of the date of Dittmar's petition but he was entitled to them on that date once the conditions precedent to their payment occurred.

The Trustee argues that Dittmar's right to these benefits issue from the payment event, not the work of the debtor. While it is true that were there no IPO, there would be no SARs, it is also true that had the debtor not been employed during the eligibility periods that spanned both pre- and post-petition time, he would not have been eligible for them. Part of his right to these payments is attributable to his continued work for Spirit–indeed that is what his union bargained for and, as the Circuit has concluded, his contingent right to these payments vested pre-petition.

The Trustee relies mostly on state court decisions from other jurisdictions and Kansas bankruptcy court cases to support her assertion that the SARs are more like stock options than wages and are therefore not exempt. Arguing from *Resler*, she asserts that at Dittmar's filing, Spirit did not hold any of the SARs for payment to him. But that is not the point here–what matters is whether the SARs were, in the words of KAN. STAT. ANN. § 60-2310(a)(1), "compensation paid or payable." The Circuit held that if the SARs were payable, they were owed to Dittmar and that his enforceable right to be paid them arose pre-petition. That is the law of this case.

The Trustee also argues that other courts have held that stock options are not wages. None of those cases speaks to an exemption claim. Rather, all of the state court cases she relies on involve claims under the respective states' "wage acts," laws that govern and generally strengthen an

---

[20] 282 B.R. 246 (Bankr. D. Kan. 2002).

7

employee's ability to enforce payment of his earnings. For example, the Kansas case *Weir v. Anaconda Co.* involved a claim made by an ex-employee under the Kansas Wage Act, KAN. STAT. ANN. § 44-313 et seq., for certain benefits that he claimed accrued under a stock option plan after he terminated his employment.[21] In *Weir*, the Tenth Circuit held that the stock option benefits were not wages. In determining whether a benefit is an "earned wage" for purposes of the Kansas Wage Act, courts are to determine whether the employment agreement places a condition precedent on the employee's receipt of the benefit or whether the agreement attempts to impose a condition subsequent that amounts to a forfeiture. A condition precedent is something that must happen, whether it be performance by a contracting party or another occurrence, before the contracting party's right to enforce the agreement arises. Where stock options are discretionary and based on the worker continuing to be employed, the termination of the worker's employment eliminates the condition precedent. In our case, Dittmar continued to be employed per his contract and the condition precedent to his entitlement to these benefits occurred.

*Truelove v. Northeast Capital & Advisory, Inc.*,[22] *Weems v. Citigroup, Inc.*,[23] and *Paolini v. Albertson's, Inc.*[24] are similar cases. All deal with the enforcement of wage act or labor law claims, not exemption statutes. In addition, the *Weems* court specifically mentions that a narrow definition of wages for the purpose of the wage act is not inconsistent with the broader definition of wages in

---

[21] 773 F. 2d 1073 (10th Cir. 1985).

[22] 95 N.Y. 2d 220, 738 N.E.2d 770 (2000).

[23] 453 Mass. 147, 900 N.E.2d 89 (2009).

[24] 143 Idaho 547, 149 P.3d 822 (2006).

8

other state laws.[25]

Kansas state court case law is equally unhelpful. In *Coward v. Smith*, the Court of Appeals held that payments to independent contractors were not "earnings" that were protected by the exemption statute because their amounts were influenced by factors other than the personal service of the worker.[26] *Coward* also held that the wage exemption protects employees, not independent contractors. Certainly Dittmar was an employee as opposed to a contractor. Moreover, the Court of Appeals noted that the Kansas Supreme Court has held that in order to be protected by the garnishment statute, pay need not be regular or periodic.[27] Thus, even though Dittmar's bonuses cannot be tied to a specific work period, they did arise from his work.

The Trustee's argument garners little support from bankruptcy case law. She relies on *In re Rangel* where a debtor sought to exempt part of his income tax refund as wages under KAN. STAT. ANN. § 60-2310.[28] There, Judge Berger held that tax refunds "are not directly traceable to wages" because "[a]lthough [refunds are] derived from compensation for personal services, the debtors' income tax withholdings ultimately became a "tax," thereby severing the direct link between the compensation and the personal services."[29] Likewise, in *In re Carbaugh*, the Tenth Circuit Bankruptcy Appellate Panel dealt with an attempt to exempt funds withdrawn from an ERISA

---

[25] 900 N.E.2d at 94, n. 10.

[26] 6 Kan. App. 2d 863, 636 P.2d 793 (1981).

[27] *Id.* at 865, *citing Harpster v. Reynolds,* 215 Kan. 327, 524 P.2d 212 (1974).

[28] 317 B.R. 553 (Bankr. D. Kan. 2004).

[29] *Id.* at 556.

9

plan.[30] The Panel concluded that even though the funds in the ERISA account originated as wages paid to the debtor, once the funds are withdrawn from the account, they are not exempt as wages. The *Carbaugh* panel declined to extend exempt status to those funds stating that "to hold otherwise would be to protect virtually every asset a debtor funded with wages.[31] These cases address fact situations very different from a debtor seeking to exempt a benefit that is directly payable to him as part of the consideration for his services. A more apposite case is *In re Price* where a bankruptcy judge sitting in Kansas held that a real estate agent who is, by contract, an independent contractor, but whose commissions are subject to her broker's control, may still claim the protection of 75 per cent of those commissions by KAN. STAT. ANN. § 60-2310.[32] If an independent contractor's commissions are protected by this exemption, certainly an employee's bonus, payable pursuant to his employment contract and earned by him through his service is, too.

There is no reason to narrow the definition of "earnings" in KAN. STAT. ANN. § 60-2310 to fit the definition of "wages" in KAN. STAT. ANN. § 44-313(c).[33] Indeed, Kansas exemptions are to be liberally construed for the benefit of the debtor.[34] The New York, Massachusetts and Idaho cases on which the Trustee relies all deal with wage claimants who have failed to meet the condition precedent to receiving stock option benefits because they terminated their employment. Each court

---

[30] 278 B.R. 512 (10th Cir. BAP 2002).

[31] *Id.* at 524.

[32] 195 B.R. 775 (Bankr. D. Kan. 1996).

[33] "Wages" "as used in this act" are defined in KAN. STAT. ANN. § 44-313(c) as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions."

[34] *Nohinek v. Logdson*, 6 Kan. App. 2d 342, 344, 628 P.2d 257 (1981).

10

held that the termination of the claimants' employment meant that at least one of the conditions precedent to the options had not occurred. The claimants' rights to the options did not vest.

In this case at the Trustee's urging, the Circuit has held that Dittmar's right to the SARs vested pre-petition. Dittmar met the condition precedent when he continued his employment for the required duration and was on the job when the payment event occurred. After all, that was the behavior that Spirit likely intended to incentivize by offering the EPP in the first place. When the condition precedents of Dittmar's incumbency and Spirit's declaration of the event both occurred, Spirit was obligated to pay the SARs to Dittmar. The SARs were "bonuses" and bonuses are expressly mentioned in the definition of "earnings" in the exemption statute.

Throughout this case, the Trustee has argued that these assets were property of the estate even though they were contingent because the debtor was entitled to them once the defined conditions were met. One of the conditions was that the debtor continue to work for Spirit for a defined duration. The Trustee cannot say in the same breath that these bonus payments, payable to the debtor in consideration of his pre- and post-petition labor and only upon condition of his remaining employed at Spirit for the defined period, are so unrelated to the services he has rendered that they cannot be "earnings." The SARs benefits were payable to Dittmar as compensation for his work under the collective bargaining agreement between his union and Spirit.

These payments are protected by the exemption of KAN. STAT. ANN. § 60-2310(b). The Trustee's claim to them is limited to the lesser of 25 per cent of Dittmar's aggregate disposable earnings for the work week in which he was paid these benefits or "the amount by which the individual's aggregate disposable earnings for that workweek or multiple thereof exceed an amount equal to 30 times the federal minimum hourly wage, or equivalent multiple thereof for such longer

11

period." These amounts should be easily calculated, but if the parties are unable to agree on the appropriate amounts, the Court will convene a brief evidentiary hearing for that purpose.

To the extent set forth above, the Trustee's objection to the debtor's exemptions is OVERRULED.

# # #